NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0475n.06

Case No. 14-3791

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 26, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHARLES JOHN BYRNE and CODY BYRNE, | ) | |
| | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| CSX TRANSPORTATION, INC., GERALD | ) | |
| R. HORN, JOHN DOES 2-10, and | ) | |
| ALPHONSE DUCRE, III, | ) | |
| | ) | |
| Defendants-Appellees. | | |

BEFORE: BOGGS, SUHRHEINRICH, and WHITE, Circuit Judges.

**HELENE N. WHITE**, Circuit Judge. This action, arising from a collision between a CSX train and a vehicle driven by Charles Byrne, returns to this court after remand and the district court's second grant of summary judgment to CSX[1] dismissing Plaintiffs' state-law inadequate-warning-devices claims as preempted. We affirm.

**I.**

In the late morning of May 19, 2008, Charles Byrne was traveling westbound on Ulsh Road in Caledonia, Ohio, with his son Cody Byrne, towards a railroad crossing. *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 673 (6th Cir. 2013). As Byrne was crossing the tracks, a CSX train struck his vehicle on the rear passenger side and caused it to flip over. Cody Byrne

_____

[1] We refer to all Defendants as "CSX."

sustained minor injuries, but Charles Byrne suffered permanent, disabling injuries, including traumatic brain injury.

The Byrnes filed this action in state court, alleging common-law negligence against CSX for failing to comply with applicable federal and state audibility requirements for warning of a train's approach, failing to exercise reasonable care in operating the train, failing to warn its crew and members of the public of the hazardous nature of the grade crossing, and failing to properly maintain the grade crossing. The Byrnes also asserted common-law negligence claims against the CSX engineer and conductor. PID 1684–85. Defendants removed the case on the basis of diversity of citizenship. *Byrne*, 541 F. App'x at 673–74.

The district court granted Defendants summary judgment on the Byrnes's state-law inadequate-warning-devices claims, finding them preempted. On the Byrnes's first appeal, this court reversed because Defendants had failed to file the sole document supporting their defense of federal preemption, the "Kirkland affidavit," and then had produced different versions of that affidavit on appeal. *Id.* at 675–77. We reversed and remanded to the district court "for consideration of the issue of federal preemption." *Id.* at 677.

On remand to the district court, Defendants renewed their motion for summary judgment submitting for the first time 1) another version of Kirkland's affidavit, 2) an affidavit of Mathew Downs, a former administrator of payroll and federal accounting at the Ohio Department of Transportation (ODOT), and 3) approximately 60 pages of exhibits not previously filed. PID 2815-2969. The Byrnes moved to strike the Downs affidavit and supporting exhibits, as well as the other newly filed exhibits attached to Kirkland's affidavit, on the ground that they exceeded this court's mandate. The Byrnes alternatively argued that, if the district court intended "to honor the new Kirkland affidavit," it should extend the discovery deadline so that they "may

conduct discovery concerning the federal funding of the Ulsh Rd. crossing." PID 2991. The district court denied the Byrnes's motion to strike the Downs affidavit and granted their motion for additional time to conduct further discovery. PID 2993-96. After deposing Kirkland and Downs, the Byrnes responded to Defendants' renewed motion for summary judgment. The district court again dismissed the claims as preempted, PID 3489-99, and the Byrnes appeal for the second time.

## II.

The Byrnes first argue that the district court exceeded this court's mandate on remand by considering evidence submitted by Defendants in support of their preemption defense that was available when they initially filed their motion, but which they submitted for the first time on remand.

We review de novo the district court's interpretation of our mandate. *United States v. Parks*, 700 F.3d 775, 777 (6th Cir. 2012); *see also Kindle v. City of Jeffersontown, Ky.*, 589 F. App'x 747, 753 (6th Cir 2014). The mandate rule requires lower courts to adhere to directives of a superior court; it is a complement to the doctrine of law of the case, under which findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994).

In the first appeal, this court's introductory paragraph reversed the grant of summary judgment on the issue of federal preemption, and remanded for "the district court to consider the issue of federal preemption in light of the evidence properly placed on the record." *Byrne*, 541 F. App'x at 673. In addressing why it declined to permit Defendants to supplement the record on appeal with the proffered missing affidavit, the panel explained that there were several versions of the affidavit and that Defendants' asserted inadvertence appeared to be "anything but

inadvertent." *Id.* at 677. The panel then stated that it "is the district court's choice whether to wade through this confusion." *Id.* The final conclusion states that the decision is reversed and the matter is remanded for consideration of the issue of federal preemption. *Id.* at 678. The district court rejected Plaintiffs' restricted view of the remand, explaining that it considered the new evidence Defendants submitted because, "as the Sixth Circuit noted, the record was heretofore devoid of any preemption evidence − be it the Kirkland affidavit or otherwise − the Sixth Circuit's mandate necessarily contemplates consideration of new evidence." PID 2994-95. We find no error in the district court's interpretation of the mandate, given that there was no evidence properly placed on the record at the time of the remand. We do not understand our remand order as restricting the evidence the district court would be permitted to consider on remand.

## III.

The Byrnes next argue that, even considering the newly submitted evidence, the district court erred in finding their claims preempted. Effectively conceding that preemption applies if federal funds were used to improve the Ulsh Road crossing, the Byrnes argue that genuine factual questions remained, given the inadequate foundation for the evidence and conclusions submitted by Defendants in support of their motion. Plaintiffs assert that Kirkland's affidavit fails the personal-knowledge requirement of Fed. R. Civ. P. 56 because she could not confirm that the Conrail invoices attached to her affidavit either went through her office or were received by the State of Ohio, and she could not attest that the Conrail invoices were kept in the course of a regularly conducted activity when there was no chain of custody in the record. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005).

Kirkland's 2014 affidavit[2] states that she was employed as Manager of the Rail Highway Safety Section of the Ohio Rail Development Corporation (ORDC) from 1994 until 2012. Before ORDC was created in 1994, she held the same position at the Ohio Department of Transportation (ODOT) beginning in 1989. At ODOT she reported to Jeff Honefanger, Deputy Director at the Division of Rail Transportation. Kirkland states her duties "included the administration and management of railroad safety programs and the responsibility for federally funded programs to improve grade crossings." PID 2824. Kirkland, her staff, and her department administered the federally funded Ohio Buckeye Crossbuck Program. Kirkland worked on a day-to-day basis with the implementation of the Crossbuck Program and further attested:

> 7. I have personal knowledge that [Conrail] entered into an agreement with the State of Ohio to participate in the Ohio Buckeye Crossbuck Program, and to install experimental Buckeye Crossbucks and upgraded Standard Crossbucks at approximately 960 of its passively guarded grade crossings in the State of Ohio. The project was assigned State Project Number 131883 and Federal-Aid Project Numbers RRPG-000S (326) and STP-000S(326).
>
> 8. Although my duties as administrator of the Ohio Buckeye Crossbuck Program did not include the actual handling of funds, as the administrator of the Program, my staff and I developed the program, established the agreements with the railroads, set up the projects with the Federal Highway Administration [FHA], and approved and processed railroad invoices and I would have been alerted had federal funds not been approved and received by the State of Ohio to fund the Ohio Buckeye Crossbuck Program. I received no notice of any failure of the federal government to fund the Ohio Buckeye Crossbuck Program.
>
> 9. I have personal knowledge that [Conrail] participated in the Ohio Buckeye Crossbuck Program and from that fact I can conclude that the approval, authorization, and expenditure of federal funds to pay for the installation of Buckeye Crossbucks and Standard Crossbucks at [Conrail's] passively guarded grade-crossings took place because the Program would not have proceeded otherwise.

---

[2] The district court's order granting Defendants summary judgment on remand cites only the 2014 Kirkland affidavit.

10. Pursuant to the agreement for the Buckeye Crossbuck Program, bills for the installation of crossbucks were to be submitted to Mr. Honefanger for my review and acceptance. Buckeye Crossbuck installation sheets were to be completed and submitted with the bills. Once the crossings were inspected and found to meet standards, the invoice was approved by me, processed by my staff to ODOT, and then payment was made by the Treasurer of State.

PID 2827, 2828. A form titled "Ohio Buckeye Crossbuck Program" stating that on May 11, 1993 two standard crossbucks were installed on Ulsh Road under "AARDOT # 262061N" is attached to Kirkland's affidavit. PID 2890. Also attached to Kirkland's affidavit are seven "Progress Bills" on Conrail letterhead addressed to Jeff Honefanger, Kirkland's boss at ODOT, and totaling $892,124.00. PID 2892-2959.

Downs was employed as ODOT's Administrator, Payroll and Federal Accounting, and his office maintained "the records for the handling of funds from the Ohio Buckeye Crossbuck Program in the 1990s, which provided improvements to railroad grade-crossing warning devices," and used the designations Project No. 000S(326) and prefixes RRPG and STPG in association with that program." Further:

3. I recognize the following documents as official records of the State of Ohio dealing with the Ohio Buckeye Crossbuck Program, including the funding of such improvements:
. . . .
E. Final Voucher from FHWA [Federal Highway Administration] to Ohio regarding Project No. 000S(326) detailing the final amount of federal funds provided to Ohio of $475,983.05 for appropriation code 139 and $479,755.10 for appropriation code 33A;

F. Records for requests for reimbursement to FHWA, which include details of payments made to Conrail from ODOT . . . .

G. Details of 100% federal reimbursement received by ODOT for construction engineering costs . . . on Project No. 000S(326), prefix RRPG, totaling $50,072.61.

4. Based upon my review of the records above, I can attest that FHWA, through the United States Highway Department Trust Fund . . . provided federal funds totaling $955,738.15 to ODOT for Project No. 000S(326).

> 5. Of that $955,738.15 . . . ODOT received reimbursement for several payments:
>
> - Reimbursement for payments made to Conrail totaling $892,124.00;
> - Reimbursements for payments made to Northern Ohio & Western Railroad totaling $13,541.54; and
> - Reimbursement for construction engineering work performed by ODOT employees totaling $50,072.61
>
> . . . .
>
> 8. Based upon my review of the records described above, under the Ohio Buckeye Crossbuck Program, the State of Ohio made nine payments to Conrail totaling $892,124.00, all of which were 100% reimbursed with federal funds received from the FHWA.

PID 2961-63.

We agree with the district court that the Kirkland and Down affidavits and deposition testimony establish that federal funds were used to improve the Ulsh Road crossing, and that the Byrnes have not established a genuine factual issue. As the district court observed, the total of the seven Conrail Progress Bills equaled the total payment made by the Federal Highway Administration to ODOT. Although Kirkland could not attest that the Conrail invoices were submitted to her office at ODOT or approved for payment by ODOT, Downs testified that the seven invoices were paid, and Kirkland testified that only approved bills were paid. And, though the chain of custody of the Conrail invoices is unclear from the record, the invoices bear Conrail logos and so the district court could properly determine them to be self-authenticating under Fed. R. Evid. 902(7). *See Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009) (document on letterhead "contains a trade inscription indicating the source of origin of the document, and it is self-authenticated under Federal Rule of Evidence 902(7).") Any defect in the chain of custody

of the Conrail invoices would go to the weight of the evidence, not its admissibility. *See United States v. Allen*, 946 F.2d 896, 897 (6th Cir. 1991) (table).[3]

For these reasons, we AFFIRM the district court's grant of summary judgment in Defendants' favor.

---

[3] We note that we find CSX's failure to establish the source of the records, through an affidavit, testimony, or attorney representation on the record, as inexplicable as the first panel found CSX's failure to file the affidavit and the appearance of multiple affidavits. Simple attention to detail and procedure would have avoided much of the proceedings. Nevertheless, the district court was free to accept that the Conrail bills were self-authenticating.